# EXHIBIT A

F9aibard ag                    DECISION

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------x

3   WILLIAM BARBOZA,

4                   Plaintiff,

5            v.                        13 Civ. 4067 CS

6   STEVEN D'AGATA, et al.,

7                   Defendants.

8   ----------------------------x

9                                     White Plains, N.Y.
                                      September 10, 2015
10                                    10:00 a.m.

11  Before:

12                      HON. CATHY SEIBEL,

13                                    District Judge

14                        APPEARANCES
    BERGSTEIN & ULLRICH
15      Attorney for Plaintiff
    STEPHEN BERGSTEIN
16
    NEW YORK CIVIL LIBERTIES UNION
17      Attorney for Plaintiff
    MARIKO HIROSE
18  JORDAN WELLS

19  DRAKE, LOEB, HELLER, KENNEDY, GOGERTY, GABA & RODD
        Attorney for Defendants
20  ADAM LAWRENCE RODD

21                        DECISION

22

23

24

25

F9aibard ag                DECISION

1         THE COURTROOM DEPUTY:  William Barboza v. Detective

2    D'Agata, et al.

3         THE COURT:  Have a seat, everyone.  Good morning

4    Mr. Bergstein, Ms Hirose, and Mr. Wells and Mr. Rodd.  If I

5    remember, Mr. Yasgur is unavailable because of a medical thing

6    and you're pinch-hitting for him, Mr. Rodd.

7         MR. RODD:  Correct, your Honor.

8         THE COURT:  Not that anything substantive is going to

9    be asked of you.  I have reviewed the papers.  Is there

10   anything that anybody wants to add that's not covered by the

11   papers.

12        Hearing nothing I will proceed.

13        I have summary judgment motions from the Village of

14   Liberty, Steven D'Agata and Melvin Gorr, who I will refer to as

15   the village defendants, and from defendant Zangala.  And I have

16   a cross-motion for summary judgment from the plaintiff.

17        The following facts are based on the parties' 56.1

18   statements and the supporting materials and are undisputed

19   except as noted.

20        Plaintiff is a resident of Bethel, Connecticut.  On

21   May 4, 2012 he was issued a speeding ticket while driving in

22   Liberty, New York.  On June 3, 2012 he pleaded guilty to a

23   speeding violation by mail.  He later received a form from the

24   Town of Liberty Justice Court accepting the guilty plea and

25   providing instructions for paying the fine.  Plaintiff returned

F9aibard ag                    DECISION

1    the payment form with his credit card information.  At the top
2    of the payment form, however, plaintiff crossed out the word
3    Liberty in Liberty Town Court and replaced it with tyranny.
4    And he also wrote in all caps and underlined across the top
5    middle section of the form the following:  Fuck your shitty
6    town bitches.  Upon receiving the plaintiff's form the town of
7    Liberty Justice Court clerk brought it to the attention of Town
8    Judge Brian Rourke.  At the time all the court clerks were
9    women.  The clerk who delivered the form to Judge Rourke
10   indicated that she and the other clerks were upset and alarmed
11   by it.  Judge Rourke believed that the phrase "fuck your shitty
12   town bitches" might be a threat to those women and he referred
13   the form to defendant Zangala, an assistant district attorney@
14   for Sullivan County, to determinesee if the communications
15   constituted a crime.  Zangala took the form back to his office
16   and showed it to fellow assistant district attorney Meagan
17   Galligan.  Zangala left the form in Galligan's office and when
18   he saw it next the form had the words "ag harassment" written
19   on it in the handwriting of Sullivan County District Attorney
20   James Farrell.  Zangala commented to Galligan that he too
21   determined that aggravated harassment was the appropriate
22   charge.  Zangala came to that conclusion only by reviewing the
23   aggravated harassment statute.  He did not speak to the clerk
24   who opened the envelope containing plaintiff's form or
25   otherwise conduct an investigation.  He later discussed the

F9aibard ag                    DECISION

1   matter with Farrell who agreed that the words written by

2   plaintiff fit the charge of aggravated harassment.  Zangala and

3   Farrell discussed the fact that plaintiff might have a First

4   Amendment defense to the charge but Farrell instructed Zangala

5   to file the charge.

6           Judge Rourke wrote to plaintiff on September 26, 2012

7   advising plaintiff that plaintiff's payment for the speeding

8   ticket would not be accepted and ordering plaintiff to appear

9   in court on October 18, 2012.  Zangala planned to file the

10  aggravated harassment charge when plaintiff appeared in court.

11  Zangala understood that upon the filing of the charge plaintiff

12  would be arrested and processed.  And since that's going to be

13  important I'm going to specify where I get that from.  I get

14  that from Zangala's deposition at pages 34, 42 to 43 and 65,

15  and plaintiff's 56.1 statement paragraph 26.  I assume somebody

16  is going to be ordering this transcript for Mr. Yasgur because

17  he's going to need it.

18          On October 18, 2012 Detective Steven D'Agata was

19  provided police security service at the Town of Liberty Justice

20  Court.  Once plaintiff entered the courtroom, Zangala showed

21  D'Agata plaintiff's comments on the payment form and told

22  D'Agata that the court clerks felt threatened by it and worried

23  for their safety because of it.  Zangala instructed D'Agata to

24  draft and file an information charging plaintiff with

25  aggravated harassment in the second degree under New York Penal

F9aibard ag                    DECISION

1    Law 240.31(a).  Plaintiff asserts that Zangala instructed

2    D'Agata to file the information, whereas the village defendants

3    say Zangala only asked D'Agata to do so.  The difference is not

4    material.

5            D'Agata drafted an information charging plaintiff with

6    aggravated harassment in the second degrees and gave a copy to

7    Zangala who reviewed and approved it.  D'Agata asked Officer

8    Melvin Gorr to assist him in arresting the plaintiff.  When

9    plaintiff's case was called, Zangala handed the information to

10   Judge Rourke, Judge Rourke reprimanded plaintiff for the

11   comments on the form, handed plaintiff the information and

12   informed plaintiff that he would be arrested.  D'Agata and Gorr

13   then handcuffed plaintiff and took him to the Village of

14   Liberty Police Department for processing.

15           The criminal charge against plaintiff was ultimately

16   dismissed as violative of plaintiff's First Amendment rights.

17           Arrests under Section 240.30 are common in the village

18   and village officers frequently face situations where they are

19   making an arrest because of the use of vulgar words in what may

20   be perceived as a threatening context.  Between 2003 and 2012,

21   the Liberty Police Department made 63 arrests under Section

22   240.31(a).  There is actually a discrepancy in the number of

23   arrests between the parties.  I count 62 but the difference is

24   not material.  These arrests include those of people who used

25   profanity, made crude sexual accusations and comments, and made

F9aibard ag                    DECISION

1   intimidating threats.  The department also made nine arrests

2   between 2003 and 2009 under 240.30 without specifying the

3   subsection.

4          From 2000 to the date of plaintiff's arrest the

5   village did not provide training to its officers concerning

6   Section 240.30(1) or on the First Amendment limitations of

7   arrests for speech or written expression.  Similarly, neither

8   the Village of Liberty Police Department general rules of

9   conduct nor the Liberty Police Department rules and regulations

10  and manual of procedure contain guidelines about arresting

11  people under 240.30 or for abusive expression.  The village has

12  no requirement to insure its officers are trained on the First

13  Amendment.  The village seemed to rely in this respect on the

14  Police Academy training that officers are required to obtain

15  before being hired, but takes no steps to freshen its officers'

16  understanding as the law develops.  The village police

17  department does not maintain hard copies or an electronic

18  database of caselaw when making arrests.  They rely on the

19  black letter law found in the penal code.

20         Scott Kinne, the officer in charge of the Liberty

21  Police Department since the end of 2011 and the chief of police

22  at the time of plaintiff's arrest testified that he was aware

23  of any cases limiting the application of Section 240.30(1), any

24  court rulings interpreting the law, or any First Amendment

25  problems arising from the law.  D'Agata also testified that he

F9aibard ag                    DECISION

1     was unaware of any court rulings interpreting the statute.

2     Kinne expects his officers to take directions from the District

3     Attorney's Office on legal questions.

4          It's a motion for summary judgment and the familiar

5     standards under Rule 45 apply.  I won't take the time to repeat

6     them; we're all familiar with them.

7          I'm going to start with qualified immunity.  An

8     official suit under Section 1983 is entitled to qualified

9     immunity unless it is shown that the official violated a

10    statutory or constitutional right that was clearly established

11    at the time of the challenged conduct.  Plumhoff v. Rickard,

12    134 S.Ct. 2012, 2023.  "In deciding questions of qualified

13    immunity at summary judgment, courts engage in a two-pronged

14    inquiry.  The first prong asks whether the facts taken in the

15    light most favorable to the party asserting the injury showed

16    the officer's conduct violated a federal right; and the second

17    prong asks whether the right in question was clearly

18    established at the time of the violation."  Respardo v.

19    Carlone, 770 F.3d 97, 113.  Under prong two, a government

20    official's conduct violates clearly established law when at the

21    time of the challenged conduct, the contours of a right are

22    sufficiently clear that every reasonable official would have

23    understood that what he is doing violates that right.  Abrams

24    v. Department of Public Safety, 754 F.3d 244, 255.  To

25    determine whether the relevant law was clearly established, we

F9aibard ag                    DECISION

1   considered the specificity with which a right is defined, the

2   existence of Supreme Court or Court of Appeals case law on the

3   subject, and the understanding of a reasonable officer in light

4   of preexisting law.  Terebesi v. Torreso, 754 F.3d 217, 231.

5   Although courts in this Circuit generally look to Supreme Court

6   and Second Circuit precedent existing at the time of the

7   alleged violation to determine whether the conduct violated a

8   clearly established right, the absence of a decision by the

9   Second Circuit or the Supreme Court directly addressing the

10  right at issue will not preclude a finding that the law was

11  clearly established, so long as preexisting law clearly

12  foreshadows a particular ruling on the issue.  Garcia v. Does,

13  779 F.3d 84, 92.

14          In this Circuit, even if the right was clearly

15  established, an officer is entitled to qualified immunity if it

16  was objectively reasonable for the officer to believe the

17  conduct at issue was lawful.  Gonzalez v. City of Schenectady,

18  728 F.3d 149, 154.  Ordinarily, determining whether official

19  conduct was objectively reasonable requires examination of the

20  information possessed by the officials at that time without

21  consideration of subjective intent.  Connecticut Ex Rel

22  Blumenthal v. Crotty, 346 F.3d 84, 106.

23          The objectively reasonable standard is not without

24  controversy, as other judges in the Circuit have described

25  objective reasonableness as part of the clearly established

F9aibard ag                    DECISION

1    inquiry rather than a separate prong.  See Judge Straub's

2    dissenting opinion in Taravella, 599 F.3d 137 where he

3    criticizes the majority for describing a two-step analysis and

4    yet relying on an extraneous third step.  Also see Okin v.

5    Village of Cornwall-on-Hudson Police Department, 577 F.3d 415,

6    433 note 11 and Walczyk v. Rio, 496 F.3d 139, 166.

7             Notwithstanding these criticisms, the Second Circuit

8    has continued to find the object reasonableness inquiry as

9    separate from that of clearly established law and I am bound by

10   those decisions.  See for example, Coggins v. Buonora, 776 F.3d

11   108, 114, and Gardner v. Murphy, 14 CV 1142, 2015 WL 3461615 at

12   page 1 from June 2 of this year.

13            Turning first to Detective D'Agata and Officer Gorr.

14   Plaintiff argues that they violated his right to be free from

15   arrest without probable cause and his right to be free from

16   arrest in retaliation for writing "fuck your shitty town

17   bitches" on a parking ticket which he asserts is protected

18   speech.  I find, unsurprisingly, that defendants violated

19   plaintiff's First Amendment rights when they arrested him under

20   New York Penal Law Section 240.30(1) which was held

21   unconstitutional by the New York Court of Appeals in 2014.  See

22   Amore v. Navarro, 624 F.3d 522, 532, where the Circuit said an

23   arrest under a statute that has been authoritatively held to be

24   unconstitutional is ordinarily a constitutional violation.

25   Speech is often provocative and challenging ... but it is

F9aibard ag              DECISION

1   nevertheless protected against censorship or punishment unless

2   shown likely to produce a clear and present danger of a serious

3   substantive evil that raises, that rises far above public

4   inconvenience, annoyance or unrest.  City of Houston, Tex. v.

5   Hill 482 U.S. 451, 461.  Restraints on speech on the basis of

6   its content except in a few limited categories are generally

7   disallowed.  Hobbs v. County of Westchester, 397 F.3d 133, 148.

8   To be criminalized threatening speech must rise to the level of

9   so-called fighting words, those personally abusive epithets

10  which when addressed to the ordinary citizen are as a matter of

11  common knowledge inherently likely to provoke a violent

12  reaction.  Williams v. Town of Greenburgh, 535 F.3d 71, 77.

13  Fighting words must tend to incite an immediate breach of the

14  speech.  Posr v. Court Officer Shield 207, 180 F.3d 409, 415.

15  A state may also ban speech that constitutes "true threats"

16  which encompasses those statements where the speaker means to

17  communicate a serious expression of an intent to commit an act

18  of unlawful violence to a particular individual or group of

19  individuals.  Virginia v. Black, 538 U.S. 343, 359.  The words

20  at issue here are not inherently likely to provoke violent

21  reaction, they were not directed at anyone in particular, and

22  could not be interpreted as threatening any particular action.

23  See Cohen v. California, 403 U.S. 15, 20 where the court said

24  that while the four-letter word displayed by the defendant is

25  not uncommonly employed in a personally provocative fashion, in

F9aibard ag               DECISION

1    this instance it was not clearly directed to the person of the

2    hearer.  Further, the words don't rise to the level of fighting

3    words, and in any event because they were mailed, they did not

4    suggest imminent action.  See Posr, 180 F.3d 416 where the

5    Court noted that the phrase "one day you're going to get yours"

6    was not fighting words in part because it was directed to a

7    time other than the immediate and carried several plausible

8    meanings that would not involve the threat of violence.

9         For these reasons I do find the defendant's First

10   Amendment rights were violated and defendants do not seem to

11   seriously contest that plaintiff suffered a constitutional

12   violation.  That's the first prong of the qualified immunity

13   test.

14        I also find that plaintiff's right not to be arrested

15   for the expression at issue was clearly established.  In the

16   complaint, plaintiff appears to proceed on both facial and as

17   applied challenges to 240.30(1), although in his brief he

18   states that his claim does not rest on the facial invalidity of

19   the statute.  I will in any event address both theories.

20        It was not clearly established at the time of

21   plaintiff's arrest that 240.30(1) was facially invalid.

22   Although the statute had previously been strictly construed to

23   reach only conduct intended to threaten or harass, such as

24   specific threats and intolerable invasions of privacy.  People

25   vs. Rodriguez, 19 Misc.3d, 830, 833, New York City Criminal

F9aibard ag                    DECISION

1   Court, 2008, citing People vs. Smith, 89 Misc.2d 789, 791,

2   Second Department 1977.  The Second Circuit noted in Vives v.

3   City of New York, 405 F.3d 115, 118 that at least as of 2002,

4   far from being so grossly and flagrantly unconstitutional that

5   any person of reasonable prudence would be bound to see its

6   flaws, several courts have specifically declined to find

7   Section 240.30(1) unconstitutional.  That's Vives at 118.

8   Since then, other courts have declined to hold the statute

9   unconstitutional.  See Adebiyi v. City of New York, 2014

10  Westlaw 4922888, page 6, where the court said at the time of

11  plaintiff's arrest in 2012, as in Vives, the section was not

12  sufficiently facially unconstitutional so as to place the

13  defendant on notice.  People v. Dimuzio, 801 N.Y.S.2d 239,

14  Appellate Term 2015, finding that section neither

15  unconstitutional on its face or as applied where the defendant

16  told the complainant that he engaged in certain sexual acts

17  with the plaintiff's wife.  See also People vs. Little 830

18  N.Y.S.2d, Appellate Term 2006, where the court said although

19  some have questioned the constitutionality of 240.30, neither

20  the Second Circuit nor the Court of Appeals has held the

21  statute unconstitutional.  And the statute was not held

22  constitutional until 2014, see People vs. Golb, 15 N.E.3d 805,

23  814 from the New York Court of Appeals, cert denied 135 S.Ct.

24  1009.  So the officers could not have been expected to know

25  that the statute was unconstitutional on its face.

F9aibard ag                    DECISION

1          It was clearly established, however, at the time of

2     plaintiff's arrest that Section 240.30(1) could not be applied

3     to expressions like the one at issue here, which though crude

4     and offensive to some, did not convey an imminent threat and

5     was made in the context of complaining about government

6     activity.  In People v. Mangano, 100 N.Y.2d 569, 570, the New

7     York Court of Appeals in 2003 upheld an as applied challenge to

8     section 240.30(1) where the defendant left five voice messages

9     on the Village of Ossining Parking Violations Bureau's

10    answering machine in which the defendant rained invective on

11    two village employees, wished them and their family ill health,

12    and complained of their job performance as well as the tickets

13    that she had received.  Mangano, 570.  The Court of Appeals

14    found this was in the scope of protected speech because

15    defendant's messages were crude and offensive but made in the

16    context of complaining about government action on a telephone

17    answering machine set up for the purpose, among others, of

18    receiving complaints from the public.  Mangano 571.  That

19    decision is on all fours with this case.  It dealt with

20    offensive language used to express to government employees

21    dissatisfaction with government action.  Indeed, the conduct in

22    Mangano was arguably closer than plaintiff's to the realm of

23    unprotected threats because it was repeated, directed at

24    specific persons and wished them harm.  And Mangano is in line

25    with well-settled Supreme Court and Second Circuit precedents

F9aibard ag                 DECISION

1   cited above to the effect that only fighting words and true

2   threats, rather than crude or offensive critiques of government

3   can be penalized.  See for example, Texas v. Johnson, 491 U.S.

4   397, 409 where the Court described flag burning as a

5   generalized expression of dissatisfaction with the policies of

6   the federal government rather than a direct personal insult or

7   invitation to exchange fisticuffs; Cohen, 403 U.S. 16, 20 where

8   the court said wearing a jacket saying "fuck the draft" did not

9   amount to fighting words; and Posr 180 F.3d 415 where "one day

10  you're going to get yours" was held not to amount to fighting

11  words.  That the court clerks who received plaintiff's message

12  was apparently alarmed by it does not alter the analysis.

13  Whether a right is clearly established is assessed in light of

14  the legal rules that were clearly established at the time.

15  Pearson v. Callahan, 555 U.S. 223, 244.  And under the

16  applicable case law, plaintiff's message could not have been

17  considered fighting words or true threats.

18          Accordingly, plaintiff's right not to be arrested for

19  the message at issue was clearly established.

20          Nonetheless I find that D'Agata and Gorr are entitled

21  to qualified immunity because under the circumstances here

22  their actions were objectively reasonable.  D'Agata and Gorr

23  executed the arrest after D'Agata was instructed to draft a

24  charge by an assistant district attorney who had in turn been

25  ordered to do so by the District Attorney which D'Agata knew.

F9aibard ag                    DECISION

1    See D'Agata's deposition at page 12 and his affidavit at

2    paragraph 11.  Plaintiff argues that this fact cannot be

3    considered in the qualified immunity analysis and points out

4    that the Second Circuit stated in In Re County of Erie, 546

5    F.3d 222, 229 that because whether a right is clearly

6    established is determined by case law, reliance upon advice of

7    counsel therefore cannot be used to support the defense of

8    qualified immunity.  But I am persuaded by the analysis in

9    McChesney v. Bastien, 2013 Westlaw 4504459 at pages 7 to 8,

10   Northern District of New York, August 22, 2013 which I

11   incorporate here without repeating, that that phrase,

12   considered in context, does not mean what it sounds like, and

13   that advice of counsel remains relevant to the objective

14   reasonableness analysis.  Further, the Second Circuit has

15   stated more recently that at the very least the solicitation of

16   legal advice informs the reasonableness inquiry.  Taravella,

17   599 F.3d 135, note 3.  So I find I can consider it.  That

18   D'Agata was instructed by Zangala to draft the charge, Zangala

19   believed there was probable cause for the charge, and Zangala

20   reviewed and approved the charge before it was filed renders

21   the officers' actions objectively reasonable.  See Amore 624

22   F.3d at 535 granting qualified immunity where the defendant

23   acted deliberately and rationally in seeking to determine the

24   then valid applicable and enforceable law before arresting

25   plaintiff even though the statute was held unconstitutional by

F9aibard ag                    DECISION

1   the New York Court of Appeals 18 years earlier; Kelly v.

2   Borough of Carlisle, 622 F.3d 248, 255-6, Third Circuit 2010,

3   where the court said that a police officer who relies in good

4   faith on a prosecutor's legal opinion that an arrest is

5   warranted under the law is presumptively entitled to qualified

6   immunity from Fourth Amendment claims premised on a lack of

7   probable cause; Kijonka v. Seitzinger, 363 F.3d 645, 648,

8   Second Circuit 2004 where the court said that consulting a

9   prosecutor goes far to establish qualified immunity; Muhammad

10  v. City of Peekskill 2008 Westlaw 4525367 at page 7, where the

11  court said normally it is reasonable for law enforcement

12  officers to rely on a prosecutor's advice in bringing charges;

13  Strawn v. Holohan, 2008 Westlaw 65586 at page 6, January 4,

14  2008 where the court said the fact that the officer consulted

15  with the DA's Office before the arrest while not dispositive of

16  the issue is a factor supporting the reasonableness of the

17  officer's actions.

18          In these circumstances, where Zangala prompted D'Agata

19  to draft the charge, Zangala let D'Agata know that he and his

20  boss approved of it and Zangala reviewed and approved the

21  instrument before it was filed, the officers could hardly be

22  expected to refuse the ADA's request or instructions.  See

23  Davis v. Scherer, 468 U.S. 183, 196, note 13 where the court

24  said it is unfair and impracticable to hold public officials

25  generally to the standard of trained lawyers; Amore, 624 F.3d

F9aibard ag                    DECISION

1    534 where the court said police officers are not expected to be

2    lawyers or prosecutors; cf. Young v. County of Fulton, 160 F.3d

3    899, 903, (2d Cir. 1998) where the court said the question is

4    not what a lawyer would learn or intuit from researching case

5    law, but what a reasonable person in defendant's position

6    should know about the constitutionality of the conduct.

7    Moreover, the cases on which plaintiff relies to argue that

8    there is no advice of counsel defense, which appear at pages 6

9    and 7 of plaintiff's reply brief are distinguishable because

10   none involved an arrest initiated by an ADA who then dragoons

11   officers into executing it.  See Lawrence v. Reed, 406 F.3d

12   1224, 1231, Tenth Circuit 2005; and O'Rourke v. Hayes, 378 F.3d

13   1201, 1210.  It is one thing for an officer to make an arrest

14   after getting advice in a case he initiated.  And in that

15   scenario the officer is still likely although not automatically

16   entitled to qualified immunity because we want officers to seek

17   legal advice to prevent improper arrests.  See Kijonka, 363

18   F.3d at 648.  It is another thing however to expect an officer

19   to refuse to proceed with a case that an ADA initiates.

20   Denying qualified immunity here would mean that we would expect

21   every cop asked to make an arrest in this situation by an ADA

22   to refuse, which cannot be the case.  See Dale v. Kelley, 908

23   F.Supp. 125, 138, Western District of New York, 1995; affirmed,

24   95 F.3d 2, where the district court said as a practical matter,

25   police officers must be able to rely on the advice of

F9aibard ag                    DECISION

1    prosecutors; the judicial system depends on this reliance.

2          Further, Judge Rourke informing plaintiff that he

3    would be arrested also supports the officer's claim for

4    qualified immunity.  It would not be reasonable to expect

5    officers to know that an action seemingly endorsed by the

6    District Attorney, assistant district attorneys, and a judge

7    was not proper.  Nor would it be reasonable to expect the

8    officers to distinguish between Mangano, which involved crude

9    criticism of government to government, and cases like Dimuzio,

10   where the crude statements were made to a civilian, especially

11   in light of the ADA's instructions.  Accordingly, D'Agata and

12   Gorr are entitled to qualified immunity.

13         Now turning to ADA Zangala.  He argues he's entitled

14   to summary judgment and dismissal of the claims against him on

15   the basis of absolute prosecutorial immunity which protects

16   prosecutors from civil suits arising from activities intimately

17   associated with the judicial phrase of the criminal process.

18   Imbler v. Pachtman, 424 U.S. 409, 430.  The essential purpose

19   of absolute immunity is to insulate from judicial scrutiny the

20   motives and reasonableness of a prosecutor's official act.

21   Robison v. Via, 821 F.2d 913, 918.  In determining whether

22   absolute immunity protects a prosecutor's conduct from civil

23   suits, courts look to the nature of the function performed

24   rather than the identity of the performer.  See Kalina v.

25   Fletcher, 522 U.S. 118, 127.

F9aibard ag                    DECISION

1          A wide range of a prosecutor's conduct is protected by

2     absolute immunity.  The Second Circuit has interpreted that

3     definition to include all conduct closely associated with the

4     judicial process which is part of the prosecutor's traditional

5     role as an advocate for the state.  Belot v. Wieshaupt, 1997

6     Westlaw 218449 at page 5.  A district attorney is not only

7     absolutely immune from civil liability for initiating a

8     prosecution and presenting the case at trial, but also immune

9     for conduct in preparing for those functions; for example,

10    evaluating and organizing evidence for presentation at trial or

11    to a grand jury, or determining which offenses are to be

12    charged.  Hill v. City of New York, 45 F.3d 653, 651.

13         A prosecutor's administrative duties and those

14    investigatory functions that do not relate to an advocate's

15    preparation for the initiation of a prosecution or for judicial

16    proceedings, however, are not entitled to absolute immunity,

17    Buckley v. Fitzsimmons, 509 U.S. 259, 273.  When a prosecutor

18    performs the investigative functions normally performed by a

19    detective or a police officer, Buckley at 273, such as giving

20    police legal advice on the propriety of investigative

21    techniques or on whether or not probable cause exists to make

22    an arrest, McCray v. City of New York, 2008 Westlaw 4352748 at

23    page 15, he or she is entitled only to the protection of

24    qualified immunity.  See Bernard v. County of Suffolk, 356 F.3d

25    495, 502.

F9aibard ag                    DECISION

1          Plaintiff argues that Zangala is not entitled to

2     absolute immunity because he ordered plaintiff's arrest which

3     is a police function.  Whether a prosecutor involved in an

4     arrest is entitled to absolute immunity depends on the

5     prosecutor's role in the arrest.  See Murphy v. Senior

6     Investigator Neuberger, 1996 Westlaw 442797 at page 10, denying

7     absolute immunity where due to an undeveloped factual record,

8     the court cannot determine precisely what the prosecutor's role

9     in the arrest was.  A prosecutor's participation in the

10    execution of an arrest is not protected by absolute immunity.

11    Day v. Morgenthau, 909 F.2d 75, 77-78.  See Hickey v. City of

12    New York, 2002 Westlaw 1974058 page 3.

13         A prosecutor's communication to police officers of his

14    decision as to precisely what charges he would lodge against an

15    individual, however, is protected by absolute immunity.  Ying

16    Jing Gan v. City of New York, 996 F.2d 522, 531.  The Second

17    Circuit has thus recognized a meaningful distinction between

18    filing a criminal information and procuring an arrest warrant

19    on the one hand and executing the arrest warrant on the other.

20    Barr v. Abrams, 810 F.2d 358, 362.

21         Zangala is entitled to absolute immunity for his

22    decision to charge plaintiff.  See Hill, 45 F.3d at 661.  But

23    if he ordered a warrantless arrest of plaintiff as opposed to

24    say a desk appearance ticket, which would not have entailed an

25    arrest, he is not absolutely immunity for that decision.

F9aibard ag                DECISION

1    Zangala failed to respond to plaintiff's properly supported

2    Local Rule 56.1 statements which states in paragraph 26:

3    Zangala directed D'Agata to charge and arrest plaintiff for

4    aggravated harassment.  Because Zangala failed to respond to a

5    properly supported statement, the statement is admitted for

6    purposes of plaintiff's motion.  See Federal Rule of Civil

7    Procedure 56(e)(2) and Giannullo v. City of New York, 322 F.3d,

8    139, 140.

9             Further, Zangala does not even argue the objective

10   reasonableness of his actions, relying only on his subjective

11   intent, which is irrelevant.  See Zangala's opposition brief at

12   page 10 and Amore, 624 F.3d at 535.

13            Finally, that Zangala ordered the arrest is amply

14   supported in the record.  See D'Agata's deposition at pages 34

15   to 35 where he says the ADA instructed me to do it and I did

16   it; Zangala's deposition at page 43 where D'Agata testified

17   that when Zangala instructed him to draw up the information,

18   Zangala also said that he is in court today and we're going to

19   arrest him; and D'Agata's affidavit in paragraph 11 which said

20   that Zangala advised D'Agata that at the time of the calendar

21   call, D'Agata was to arrest the plaintiff after he was charged;

22   also see Zangala's reply declaration, paragraph 11, where he

23   points out that a criminal prosecution can be initiated by

24   appearance tickets issued by law enforcement officer or by an

25   arrest; Zangala's deposition at page 65, where Zangala says an

F9aibard ag                    DECISION

1    decision to file an accusatory instrument and an arrest go hand

2    in hand; Zangala's deposition at 28 to 30 where he testifies he

3    planned to have plaintiff arrested when he showed up for court

4    and he would have discussed that with Judge Rourke in advance;

5    and Judge Rourke's deposition at pages 59 to 60 where he

6    testified he understood in advance that the plaintiff was going

7    to be charged and believed that Zangala also determined that

8    the plaintiff would be arrested.  Accordingly, while Zangala is

9    entitled to absolute immunity for the decision to charge

10   plaintiff, he has not shown that he is entitled to absolute

11   immunity for the decision to arrest plaintiff.  And plaintiff

12   has shown that he is not.

13            So plaintiff's motion is granted and Zangala's motion

14   is denied on the issue of absolute immunity for the decision to

15   arrest plaintiff.

16            I now turn to qualified immunity.  I also find that

17   Zangala is not entitled to qualified immunity for instructing

18   D'Agata to make the arrest.  For the same reasons I've already

19   discussed, plaintiff's arrest violated his clearly established

20   constitutional right to engage in and be free from arrests

21   because of protected speech.  Zangala argues that he did not

22   believe there was a constitutional bar to charging plaintiff

23   with a crime, his reply at page 10.  I don't quite see how one

24   can at once believe that the First Amendment could be raised as

25   a defense to the charge and at the same time be unaware of any

F9aibard ag                   DECISION

1    constitutional impediments to bringing the charge.  It almost

2    sounds like D'Agata and Farrell knew the arrest was

3    unconstitutional but were willing to go forward and wait and

4    see if plaintiff would realize it.  I'm not sure that's what

5    Zangala means, I hope not.  But in any event I may not consider

6    an official's subjective intent in determining whether he is

7    entitled to qualified immunity, that's Amore at 535.

8              I also note that Zangala has directed the Court to

9    Heien v. North Carolina, 135 S. Ct. 530.  He brought that to my

10   attention in docket entry 68.  That court held that a

11   reasonable mistake of law can support reasonable suspicion to

12   initiate the traffic stop, 135 S. Ct. 534, 540.  Heien is

13   distinguishable not only because it is not a qualified immunity

14   case and reasonable mistakes of law have been recognized as

15   excusable in the qualified immunity context long before Heien,

16   see Saucier 533 U.S. at 205, but because Zangala's mistake was

17   not reasonable.  In that respect, Zangala's qualified immunity

18   claim differs from D'Agata's and Gorr's.  The precedent

19   distinguishing police officers from lawyers, which helps the

20   officers, hurts Zangala.  If cops are not expected to know what

21   a lawyer would learn or intuit from researching case law, Amore

22   at 533-34, an assistant district attorney certainly is.  And

23   there surely is nothing unfair or impracticable about holding a

24   trained lawyer to the standard of trained lawyer.  While it is

25   reasonable for a police officer to rely in certain

F9aibard ag               DECISION

1   circumstances on the legal advice of a prosecutor, the

2   prosecutor himself must be held to the standard of a trained

3   lawyer.  See Kijonka 363 F.3d at 648 which denied qualified

4   immunity to a prosecutor because no prosecutor, a law-trained

5   specialist in the enforcement of the criminal law, could

6   reasonably believe that the defendant had committed a crime

7   while granting qualified immunity to an officer who consulted

8   and was instructed to arrest by the prosecutor.  See also Davis

9   v. Scherer, 468 U.S. at 196 note 13.  As the Supreme Court

10  stated in the Connick case, 131 S. Ct. 1361-62, legal training

11  is what differentiates attorneys from average public employees.

12  Attorneys are trained in the law and equipped with the tools to

13  interpret and apply legal principles, understand constitutional

14  limits, and exercise legal judgment.  Before they may enter the

15  profession and receive a law license, all attorneys must

16  graduate from law school or pass a substantive examination.

17  Attorneys in the vast majority of jurisdictions must do both.

18  These threshold requirements are designed to insure that all

19  new attorneys have learned how to find, understand and apply

20  legal rules.  Nor does professional training end at graduation.

21  Most jurisdictions require attorneys to satisfy continuing

22  education requirements.  That's also from the Connick case.

23        For these reasons, Zangala is not saved by his getting

24  approval from the District Attorney in the way that the

25  officers are saved by complying and getting approval from an

F9aibard ag                    DECISION

1   assistant district attorney.  See O'Rourke v. Hayes, 378 F.3d

2   1201, 1210 where the court said officers cannot rely on the

3   orders of a superior if there is a reason why any of them

4   should question the validity of that order.  Zangala's actions

5   are even less reasonable given that he had the time to do the

6   relatively simple legal research but did not.

7          Accordingly, Zangala is not entitled to qualified

8   immunity, Zangala's motion for summary judgment is denied, and

9   plaintiff's motion for summary judgment as to liability is

10  granted as to Zangala.

11         Turning now to municipal liability.  Congress did not

12  intend municipalities to be held liable under Section 1983

13  unless action pursuant to official municipal policy of some

14  nature caused a constitutional tort.  That's Monell v.

15  Department of Social Services, 436 U.S. 658.  Thus, to prevail

16  on a claim against a municipality under Section 1983 based on

17  acts of a public official, a plaintiff is required to prove

18  actions taken under color of law, deprivation of a

19  constitutional or statutory right, causation, damages, and that

20  an official policy of a municipality caused a constitutional

21  injury.  Roe v. City of Waterbury, 542 F.3d 31, 36.

22         As discussed above, I find that plaintiff suffered a

23  deprivation of his First Amendment rights when he was arrested

24  under color of law.  The parties' argument focus on the fifth

25  and third elements to which I now turn.  I'm going to take the

F9aibard ag                    DECISION

1    fifth element first which is whether a policy of the

2    municipality caused the injury.  That element reflects the

3    notion that a municipality may not be held liable under Section

4    1983 solely because it employs a tort feasor.  In Re Dayton

5    2011 Westlaw 2020240 at page  8.  There must be a direct causal

6    link between a municipal policy or custom and the alleged

7    constitutional deprivation.  City of Canton v. Harris, 489 U.S.

8    378, 385.  An act performed pursuant to a custom that has not

9    been formally approved by an appropriate decision-maker may

10   fairly subject a municipality to liability on the theory that

11   the relevant practice is so widespread as to have the force of

12   law.  Board of County Commissioners v. Brown, 520 U.S. 397,

13   404.  Monell's reach, therefore, goes beyond unconstitutional

14   policies that have been formally endorsed by the municipality

15   and includes instances in which a municipality's knowledge of

16   and support for its officers' unconstitutional conduct can be

17   inferred from its failure to curtail that conduct.  MacIsaac v.

18   Town of Poughkeepsie, 770 F.Supp.2d 587, 597.  See

19   Dorsett-Felicelli v. County of Clinton, 371 F.Supp.2d 183, 194.

20   In City of Canton the Supreme Court established that a

21   municipality can be liable for failing to train its employees

22   where it acts with deliberate indifference in disregarding the

23   risk that its employees will unconstitutionally apply its

24   policies without more training.  Amnesty America v. Town of

25   West Hartford, 361 F.3d 113, 129.  Failure to train, however,

F9aibard ag                    DECISION

 1   is a narrow basis of liability, and any municipality's
 2   culpability for a deprivation of rights is at its most tenuous
 3   where a claim turns on failure to train.  Connick, 131 S.Ct. at
 4   1359.  See Tuttle, 471 U.S. 822-23.  To satisfy the statute, a
 5   municipality's failure to train its employees in any relevant
 6   respect must amount to deliberate indifference to the rights of
 7   the persons with whom the untrained employees come into
 8   contact.  City of Canton at 388.  Only then can such a
 9   shortcoming be properly thought of as a city policy or custom
10   actionable under Section 1983.  Canton at 389; see Connick at
11   1359-60 where the court said deliberate indifference is a
12   stringent standard of fault requiring proof that a municipal
13   actor disregarded a known or obvious consequence of his action.
14   And see Brown 520 U.S. at 410 and Cash v. County of Erie, 2011
15   Westlaw 3625093 at page 7 Second Circuit August 18, 2011.
16   Thus, when city policy-makers on actual or constructive notice
17   that a particular omission in their training program causes
18   city employees to violate citizens' constitutional rights, the
19   city may be deemed deliberately indifferent if the
20   policy-makers choose to retain that program.  Brown, 520 U.S.
21   at 407.  The city's policy of inaction in light of notice that
22   its program will cause constitutional violations is a
23   functional equivalent of a decision by the city itself to
24   violate the Constitution.  That's Justice O'Connor's decision
25   in Canton, confirming in part and dissenting in part, at page

F9aibard ag                    DECISION

1    395.

2         A pattern of similar constitutional violations by

3    untrained employees is ordinarily necessary to determine

4    deliberate indifference for purposes of failure to train.

5    Connick at 1360.  Policy-makers continued adherence to an

6    approach that they know or should know has failed to prevent

7    tortious conduct by employees may establish the conscious

8    disregard of the consequences of their actions, the deliberate

9    indifference to necessary to trigger municipality liability.

10   Bryan County, 520 U.S. at 407.  Without notice that a course of

11   training is deficient in any particular respect,

12   decision-makers can hardly be said to have deliberately chosen

13   a training program that will cause violations of constitutional

14   rights.  See Connick at 1360.

15        There's no dispute that the village did not provide

16   training of any kind to its officers on First Amendment issues.

17   I find, however, that there is a fact issue on the existence of

18   a pattern of similar constitutional violations sufficient to

19   put the village on notice of the need for training with respect

20   to 240.30(1).  It's undisputed that the village was not on

21   notice of any judicial determinations that the conduct of its

22   police officers violated the First Amendment.  Plaintiff has,

23   however, provided nine criminal informations from 2007 through

24   2010 -- although some of the dates are redacted so I'm not sure

25   they all fall in that window -- accusing people other than

F9aibard ag                DECISION

1    plaintiff of violating that same section for reasons that

2    plaintiff argues are unconstitutional.  They're Exhibit 16 to

3    Mr. Bergstein's affidavit.  While the degree of threatening

4    language found in these informations varies, a jury could

5    conclude that at least some of them reflect an unconstitutional

6    basis for arrest under 240.30(1) similar to plaintiff.

7            For example, looking at those exhibits, at page 1, the

8    information charged someone with, the defendant with calling

9    someone a slut and saying go fuck yourself.  The second one

10   involved repeatedly stating fuck you and bitch.  The third one

11   is talking about sexual acts on a police department phone line.

12   The fourth is about someone saying I'm going to run you and

13   your tow trucks off the road, see how much that will cost you.

14   The fifth is threatening to kill someone's dog.  The sixth is

15   saying you betterer watch your ass in town.  The seventh is a

16   threaten to wash you up.  The eighth is the statement if I

17   can't have you then no one can have you.  And the ninth is

18   calling someone a punk ass motherfucker.  I can't say that

19   these statements constitute a pattern of constitutional

20   violations as a matter of law, because (a) they don't reflect

21   that arrests were actually made and (b) even if they did there

22   may have been circumstances of the arrest not reflected in the

23   information.  And it is a jury question whether they are

24   frequent enough to amount to a custom.  On the other hand, I

25   don't say that no rational juror could be persuaded by them.

F9aibard ag                    DECISION

1          The plaintiff also attaches criminal informations

2     accusing people of violating 240.20(3), the disorderly conduct

3     statute.  Those are Exhibit 17 to Mr. Bergstein's affidavit.

4     They can also be used to support the idea that the village had

5     a custom of arresting people for foul language in the absence

6     of a legitimate threat.

7          I also find plaintiff can proceed at trial on a single

8     incident theory of liability.  Under Canton and Connick, in a

9     narrow range of circumstances a plaintiff need not show a

10    history or pattern of prior violations because the need for

11    more or different training is patently obvious.  Connick at

12    1360-61.  Contrary to defendant's argument, this remains good

13    law after Connick.  See Chamberlain v. City of White Plains,

14    986 F.Supp.2d 363, 391.  To succeed op this theory, plaintiff

15    must show that a policy-maker knows to a moral certainty that

16    its employees will confront a certain situation, that the

17    situation presents the employee with a difficult choice of the

18    type training will make less difficult, and that violation of

19    constitutional rights is a highly predictable consequence of

20    the failure to train.  Walker v. City of New York, 974 F.2d

21    293, 297; Connick at 1361; see Chamberlain 986 F.Supp.2d at

22    391.  There's evidence the village knew its officers would

23    confront situations similar to plaintiff's.  Police Chief Kinne

24    testified that arrests under the same statute were common, and

25    D'Agata testified that it was a pretty common charge for patrol

F9aibard ag                    DECISION

1     officers though he said it was not one of his most common

2     charges.  The village also made some 62 arrests under the

3     statute between 2003 and 2012.  Given that the statute in force

4     at the time of plaintiff's arrest authorized unconstitutional

5     arrests the jury could, but would not be required, to find that

6     this evidence shows to a moral certainty on the part of the

7     village that officers would confront situations like

8     plaintiff's.  Also, given that the statute authorized unlawful

9     arrests, a jury could conclude that constitutional violations

10    were a highly predictable consequences of the village's failure

11    to train, but because police officers receive some training on

12    First Amendment at the Police Academy and because D'Agata and

13    Gorr submit in their affidavits that a result of their Police

14    Academy training they knew that a citizen could not be

15    criminally charged for engaging in speech that is merely

16    alarming or annoying or which criticizes the government, even

17    if crude and profane, a jury would not be required to so

18    conclude.

19            There is also a fact issue as to causation.  In

20    analyzing a Monell claim rigorous standards of culpability and

21    causation must be applied to insure that the municipality is

22    not held liable solely for the actions of its employee.  That's

23    Brown, 528 U.S. 397, 405.  Plaintiff must identify a specific

24    deficiency in the village's training program and establish that

25    that deficiency is closely related to the ultimate injury such

F9aibard ag                    DECISION

1    that it actually caused the constitutional deprivation.

2    Amnesty America, 361 F.3d. at 129.  In other words, plaintiffs

3    must demonstrate that the employee's shortcomings resulted from

4    a faulty training program rather than from other unrelated

5    circumstances.  That's Amnesty America, at 129-30.  The

6    relevant inquiry is thus would the injury have been avoided had

7    the employee been trained under a program that was not

8    deficient in the identified respect.  Canton at 391.

9         The village and the plaintiff agree that Zangala

10   directed D'Agata to make the arrest.  There is thus a strong

11   argument that plaintiff's arrest was caused by Zangala's

12   direction and not the village's policy.  By the way, that

13   agreement can be found in paragraphs 26 of the respective 56.1

14   statements.  So if we assume that Zangala directed D'Agata to

15   make the arrest, there is a good argument that the arrest was

16   caused by Zangala and not by the village's policy.

17        But I cannot find lack of causation as a matter of law

18   in these circumstances.  In a situation where an officer

19   blindly follows the prosecutor's instructions without no

20   opportunity to reflect on or analyze it, I suspect that as a

21   matter of law causation cannot exist.  But given that Zangala

22   knew the basis of the charge, the text of the statute and, as

23   he asserts in his affidavit, that crude or offensive language

24   could not be criminalized, or language which criticizes the

25   government could not be criminalized even if crude or profane,

F9aibard ag               DECISION

1    and that he sat for a period of time after the initial

2    instruction drafting the charge and reviewed it with Zangala

3    before filing it, I can't rule out the possibility that a

4    rational juror might conclude that a properly trained officer

5    would have rejected Zangala's request or at least opened a

6    dialogue that might have avoided plaintiff's arrest.  See Back

7    v. Hastings-on-Hudson Union Free School District, 365 F.3d 107,

8    126 where the evidence was insufficient to find as a matter of

9    law that an intervening cause was sufficient to break the chain

10   of causation.  Although I find it most unlikely based on the

11   evidence before me, I cannot make the causation determination

12   as a matter of law given my obligation at this stage to

13   construe the facts in plaintiff's favor.

14           So in conclusion, and for the foregoing reasons, the

15   village defendant's motion is granted as to D'Agata and Gorr

16   and denied as to the village.

17           Zangala's motion is denied.

18           Plaintiff's motion is denied as to D'Agata, Gorr and

19   the village but granted as to Zangala.

20           Plaintiff's Monell claim will proceed to trial where I

21   assume the issues will be the existence of a pattern of similar

22   violations, the obviousness of the risk of violations under a

23   single incident theory, and whether the village's failure to

24   train caused plaintiff's arrest.  And the trial will also

25   determine the damages, if any, on plaintiff's claim against

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F9aibard ag                    DECISION

1   Zangala.

2          So the Clerk of the Court needs to terminate three

3   motions, 49, 54 and 59 and also terminate D'Agata and Gorr as

4   parties.

5          I want to set a trial date.  It's going to be, I

6   guess, hard to do without Mr. Yasgur unless Mr. Rodd you know

7   his schedule.

8          MR. RODD:  I don't, your Honor.

9          THE COURT:  I also think this case needs to settle

10  now.  Come to the sidebar for a second.

11         (Discussion off the record)

12         THE COURT:  I'm going to refer the parties to Judge

13  Smith for settlement and I don't want to set a trial date in

14  Mr. Yasgur's absence.  So why don't we say by two weeks from

15  today, by the 24th, the parties will send me a joint letter

16  with a proposal for trying the case and that letter should

17  include the dates counsel are actually engaged or on vacation

18  or have medical stuff scheduled.  So if you can give me windows

19  I'll take one that works for me.  I only have at this point --

20  I had a long criminal case go away so at this point I only have

21  a couple of short trials scheduled between now and year-end so

22  I do want to do this by year-end if it can't be resolved, which

23  I hope it can be.

24         Mr. Bergstein, I'm going to put you in charge of

25  making sure I get that letter.  You're the one who has to beat

F9aibard ag                    DECISION

1   up on everybody else if they're having a hard time getting

2   together.   Anything else we should do now?

3           MR. BERGSTEIN:  No, your Honor.

4           MR. RODD:  Thank your Honor.

5           THE COURT:  Thank you all.

6           (Proceedings adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25